1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PORTFOLIO  HOTELS, LLC,<br><br>                                        Petitioner,<br><br>       v.<br><br><br>1250 NORTH SD, LLC; SAN DIEGO<br>HOTEL CIRCLE OWNER, LLC,<br><br>                                      Respondents. | Case No. 21-cv-00314-BAS-MSB<br><br>**ORDER GRANTING PETITION TO COMPEL ARBITRATION**<br><br>**(ECF No. 1)** |

Portfolio Hotels, LLC brings this Petition to Compel Arbitration (ECF No. 1 ("Petition")). Respondents 1250 North SD, LLC and San Diego Hotel Circle Owner, LLC oppose the Petition (ECF No. 11 ("Opposition")). Petitioner replies (ECF No. 13 ("Reply")). Following oral argument and for the reasons stated below, the Court **GRANTS** the Petition and orders the parties to arbitration.

## I.    STATEMENT OF FACTS

The Respondents in this matter, San Diego Hotel Circle Owner, LLC ("SDHCO") and 1250 North San Diego, LLC ("1250 North") operated the DoubleTree by Hilton, San Diego in Mission Valley (the "Hotel").  (Pet. ¶ 9.)  According to Petitioner's counsel at oral argument, Oak Coast was an 80% owner of the Hotel.  The Respondents entered into a Management Agreement with Petitioner Portfolio Hotels, LLC ("Portfolio") to manage

21cv314

the Hotel.  (Pet. ¶¶ 10–11; Ex. A to Pet. ("Management Agreement").)[1]  The Management Agreement is summarized below.

Ladder Capital Finance, LLC ("Ladder") lent money to related entities,  San Diego Hotel Circle Mezzanine, LLC ("SDHC Mezzanine") and 1250 North San Diego Mezzanine, LLC ("1250 North Mezzanine") pursuant to a loan agreement.  As part of that loan agreement, Respondents, Portfolio, and Ladder entered into a Subordination Agreement under which Respondents assigned the Management Agreement between Respondents and Portfolio to Ladder and agreed that Portfolio would "subordinate its interest in the Management Fees" to the liens and security interests created for the benefit of Ladder.  (Ex. B to Opp'n.)[2]  The terms of the Subordination Agreement are set out below.

At some point, Ladder declared the parties were in violation of the loan agreement because the Hotel had been transferred to CHRG Perillo and Ladder declared the parties to be in default.  The Hotel, which had been offered as collateral for the loan, was bought at auction by Ladder's affiliate LSDDT, LLC.  (Pet. ¶ 16.)  Portfolio demanded unpaid management fees and payroll-related expenses for the time period before Ladder had defaulted on the property, and LSDDT, LLC terminated Portfolio as the property manager of the Hotel.

Ladder and SDHCO filed a lawsuit in the Supreme Court of New York.  The first cause of action was for declaratory judgment, requesting that the court declare that any amounts due to Portfolio under the Management Agreement are subordinate to the lender's rights under the Subordination Agreement.  The second cause of action was for breach of the Management Agreement, alleging Portfolio mismanaged the Hotel.  The New York judge granted Portfolio's motion to dismiss the second cause of action for lack of subject matter jurisdiction.   The judge found that the Management Agreement and the

---

[1] All exhibits to the Petition are attached in a single docket entry.  (*See* ECF No. 1-2.)
[2] All exhibits to the Opposition are attached in a single docket entry.  (*See* ECF No. 11-1.)

21cv314

1  Subordination Agreement were separate agreements and that the Management Agreement
2  was required to be heard in California court.  That ruling is currently on appeal.

3      **A.    Management Agreement**

4          The Management Agreement was entered into on March 23, 2015 between SDHCO
5  and 1250 North (the "Owners") and Portfolio (the "Manager") for a term of ten years and
6  concerned the management of the Hotel, including how it would operate, calculation of
7  management fees, expenditures for the Hotel, and insurance and indemnification, among
8  other issues. The Management Agreement stipulated that it would be governed in all
9  respects by the laws of the State of North Carolina.  (Management Agreement § 20.)  It
10 further has a forum selection clause requiring that "any action brought to enforce any of
11 the provisions of the agreement shall be instituted in a court of competent jurisdiction in
12 Ssan [sic] Diego, California." (*Id.*)

13         Of particular relevance to this lawsuit, the Management Agreement stipulated that
14 "[t]he parties shall submit any dispute concerning this Agreement, including the
15 interpretation of or the enforcement of rights and duties hereunder to final and binding
16 arbitration by a licensed attorney . . . who has had at least 15 years of experience in
17 negotiating, drafting and/or interpreting hotel management agreements." (Management
18 Agreement § 14.)  The Management Agreement outlined the method for choosing an
19 arbitrator: "In the event the parties cannot mutually agree on an Arbitrator within five
20 business days, the Manager shall select one Arbitrator and Oak Coast shall select one
21 Arbitrator within five business days thereafter." (*Id.*)  The Management Agreement further
22 provided that "[t]he arbitration shall be held at 10:00 am on the 10th Business Day after
23 the arbitrator is selected at the office of the Arbitrators unless the parties agree in writing
24 to a different time or date." (*Id.*)  "There will be no discovery prior to the arbitration."
25 (*Id.*)  "The Arbitrator will have three business days after arbitration to issue a decision as
26 to whether consent was reasonably withheld." (*Id.*)

27
28

21cv314

The Management Agreement was signed by Graham Hershman on behalf of Portfolio, by Graham Hershman as President of SDHCO, and by Phillip Nahas as President of 1250 North.[3]  (*Id.*)

## B.    Subordination Agreement

The Subordination Agreement ("a Conditional Assignment of Management Agreement and Subordination of Management Fees") was entered into four days later between Ladder, SDHCO, 1250 North, and Portfolio.  In the Subordination Agreement, SDHC Mezzanine and 1250 North Mezzanine agreed to a Promissory Note indebted to Ladder in the amount of $5,750,000.  (Subordination Agreement, Recitals C.)  In exchange, Ladder required that the borrowers assign the previously described Management Agreement to Ladder, and that Portfolio agree to subordinate its interest in the management fees to the loan amount.  As additional collateral for the Loan, the borrowers agreed to conditionally transfer and assign to Ladder all of the Borrower's rights, title, and interest in the Management Agreement.  (*Id.* § 1.)  Furthermore, Portfolio agreed it "shall . . . not contest or impede the exercise by [Ladder] of any right it has under or in connection with this Assignment."  (*Id.* § 7.)

Portfolio agreed that the Management Agreement, fees, liens, rights, and interests it held are "subordinate and inferior to the liens and security interests" created for the benefit of Ladder.  (Subordination Agreement § 2.)  Upon default, Ladder may terminate the Management Agreement.  (*Id.* § 4.)  Finally, "[i]n the event of any inconsistency between the terms and conditions hereof and the terms and conditions of the Management Agreement," the parties agreed that "the terms and conditions set forth in this Assignment shall govern."  (*Id.* § 22.)

---

[3] According to Petitioner's counsel at oral argument, Portfolio and SDHCO were both owned by related LLCs, and ultimately by the same individuals including Graham Hershman.  Portfolio owned 20% of the Hotel.  Oak Coast and 1250 North were owned by different LLCs and individuals than Portfolio and SDHCO and owned 80% of the Hotel.

The parties agreed that any dispute involving the Subordination Agreement would be governed by New York law, and they agreed that any lawsuit would be filed in federal or state court in the City of New York. (Subordination Agreement § 13b.)

The Subordination Agreement was signed by "Borrowers" Phillip Nahas as President of 1250 North Mezzanine; Graham Hershman as President of SDHC Mezzanine; Mark Ableman as Executive Director of Ladder; and Graham Hershman on behalf of Portfolio.

## II.     ANALYSIS

### A.     Choice of Law

"In a diversity case, the district court must apply the choice-of-law rules of the state in which it sits." *Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Ledesma v. Jack Stewart Produce, Inc.*, 816 F.2d 482, 484 (9th Cir. 1987)). California law "reflects a strong policy favoring enforcing [choice-of-law] provisions" in contracts negotiated at arm's length. *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 465 (1992). Thus, the choice-of-law provision in the Management Agreement should be enforced unless the chosen state, North Carolina, "has no substantial relationship to the parties or the transaction or there is no other reasonable basis for the parties' choice." *Id.* Alternatively, the choice-of-law provision in a contract should not be enforced if "application of the law of the chosen state would be contrary to the fundamental policy of a state which has a materially greater interest than the chosen state in the determination of a particular issue" and which "would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id.*

Although the parties dispute whether North Carolina law or California law should be applied in this case, they both conceded at oral argument that the ultimate choice-of-law likely has no effect on the ultimate issue, since the laws on arbitration in both jurisdictions are the same.

In this case, the Management Agreement clearly has a choice-of-law provision that specifies North Carolina law should be applied. Respondents argue this provision should

not be enforced because there is no substantial relationship between North Carolina and the parties or the transaction and there is no other reasonable basis for this choice. Petitioner counters that the original parties to the Management Agreement owned three hotels with similar management agreements, one of which was in North Carolina.

Ultimately, the Court finds that there is a sufficient relationship with North Carolina to apply the choice-of-law provision in the Management Agreement. But, as laid out below, the Court finds no distinguishable differences between the law of the two jurisdictions.

### B.    Colorado River Doctrine

Respondents ask this Court to stay or dismiss the action under the "Colorado River doctrine" because of the pending state court matter in New York. *Colorado River Water Conservation Dist. v. United States* ("*Colorado River*"), 424 U.S. 800 (1976). "Abstention from the exercise of federal jurisdiction is the exception not the rule." *Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 841 (9th Cir. 2017) (quoting *Colorado River*, 424 U.S. at 813). "[F]ederal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" *Id.*; *see also Smith v. Cent. Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1033 (9th Cir. 2005) (holding that a stay under the *Colorado River* doctrine occurs only in "exceedingly rare" circumstances).

"Nevertheless, abstention is considered appropriate in a few well-defined areas to ease friction between federal and state sovereigns." *American Intern. Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253, 1257 (9th Cir. 1988). Thus, when allowing a state court to construe state law or to address difficult questions of state law involving policy issues, or where federal jurisdiction has been invoked to restrain state criminal proceedings, *Colorado River* may be applicable. *Id.* Factors to consider include:

> (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal

1
2

litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all the issues before the federal court.

3
4
5
6

*Seneca Ins.*, 862 F.3d at 841–42. "These factors are not a 'mechanical checklist.'" *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Construct. Corp.*, 460 U.S. 1, 16 (1983)). "Rather . . . we examine them in 'a pragmatic, flexible manner with a view to the realities of the case at hand.'" *Id.* (quoting *Moses H. Cone*, 460 U.S. at 2).

7
8
9
10
11
12
13
14
15
16
17
18
19

With respect to the final factor, the question "is whether the state court proceeding sufficiently parallels the federal proceedings. Although we have not always required 'exact parallelism,' the two actions must be 'substantially similar.'" *R.R. Street & Co., Inc. v. Transport Ins. Co.*, 656 F.3d 966, 982 (9th Cir. 2011) (quoting *Nakash v. Mariciano*, 882 F.2d 1411, 1416 (9th Cir. 1989)). "'[T]he existence of a substantial doubt as to whether the state proceedings will resolve the federal action precludes' a *Colorado River* stay or dismissal." *R.R. Street*, 656 F.3d at 982 (quoting *Cent. Ariz. Water Conservation Dist.*, 418 F.3d at 1028); *see also Intel. Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 913 (9th Cir. 1993). "When a district court decides to dismiss or stay under *Colorado River,* it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all." *Intel Corp.*, 12 F.3d at 913 (quoting *Moses H. Cone*, 460 U.S. at 28)

20
21
22
23
24
25
26
27
28

In this case, there is a substantial doubt as to whether the litigation in New York state court will resolve the federal action. The State Court Judge has already refused to rule on the Management Agreement, finding that the issue should be litigated in California. Although that issue is currently on appeal, the Court finds it likely that the appellate court will find, as this Court does below and as the New York Supreme Court already found, that the Management Agreement is separate and distinct from the Subordination Agreement. Thus, the likelihood of inconsistent or piecemeal litigation is remote. Furthermore, the Hotel at issue is in California, and ruling on the Management Agreement does not impact

21cv314

any New York state policy questions.  Therefore, the Court declines to apply the *Colorado River* doctrine to this case.

### C.   Precedence of Subordination Agreement

Respondents next argue that the Petition should be denied "because it violates Portfolio's explicit agreement in the Subordination Agreement to not contest any exercise by Lender of its rights thereunder."  (Opp'n at 18–21.)  Ladder points out that the Subordination Agreement, by its terms, takes precedence over the Management Agreement.  (Subordination Agreement § 22.)

However, the fact that Portfolio is seeking fees allegedly due under the Management Agreement is not contesting the right of Ladder to subordinate any fees owed to the underlying debt.  The two agreements are separate: one concerns whether Portfolio is entitled to management fees at all and the other concerns who gets the money that is owed first.  There is no inconsistency between Portfolio seeking a declaration that it is owed fees and its agreement to allow Ladder to get paid first.  Therefore, the Subordination Agreement does not control the issue raised by this petition: whether Portfolio is owed fees at all.

### D.   Unconscionability of Arbitration Provision

Respondents argue that even if this Court refuses to stay or dismiss the Petition pursuant to the *Colorado River* doctrine and finds the Subordination Agreement is not controlling, it should still refuse to enforce the arbitration provision in the Management Agreement because the provision is unconscionable.

If a party challenges the validity of an arbitration provision as unconscionable, the federal court must consider the challenge before ordering compliance with the term.  *Rent-a-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010).  "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."  *Moses H. Cone*, 460 U.S. at 24.  "[A]ny doubts concerning the scope of arbitrable issue should be resolved in favor of arbitration."  *Id*. at 25.

21cv314

1        "While federal policy favors arbitration agreements, federal courts rely on state law

2 when addressing issues of contract validity and enforceability." *Laster v. T-Mobile*, 407

3 F. Supp. 2d 1181, 1186 (S.D. Cal. 2005) (citing *Ticknor v. Choice Hotels Int'l, Inc*., 265 F.

4 3d 931, 936–37 (9th Cir. 2001)).   "North Carolina has a strong public policy favoring

5 arbitration." *Crossman v. Life Care Ctrs. of Am., Inc*., 225 N.C. App. 1, 4 (2013) (quoting

6 *Raper v. Oliver House, LLC*, 180 N.C. App. 414, 419 (2006)); *see also Bigler v. Harker*

7 *School*, 213 Cal. App. 4th 727, 735 (2013) ("'California courts have uniformly

8 acknowledged that there is a strong public policy in favor of arbitration.' Thus, 'doubts

9 concerning the scope of arbitrable issues are to be resolved in favor of arbitration.'")

10 (quoting *Young Seok Suh v. Super. Ct.*, 181 Cal. App. 4th 1504, 1511–12 (2010)).

11 However, "as a general rule, [North Carolina] courts will not enforce unconscionable

12 contracts." *Rite Color Chem. Co., Inc. v. Velvet Textile Co., Inc.*, 105 N.C. App. 14, 18

13 (1992); *see also Armendariz v. Found. Health Psychcare Servs., Inc*., 24 Cal. 4th 83, 114

14 (2000) ("[A] [California] court can refuse to enforce an unconscionable provision in a

15 contract.").

16        "[U]nconscionability is an affirmative defense," and "the party asserting the defense

17 has the burden of establishing that the agreement was unconscionable." *Westmoreland v.*

18 *High Point Healthcare, Inc*., 218 N.C. App. 76, 80 (2012) (citing *Tillman v. Com. Credit*

19 *Loans*, 362 N.C. 93, 101 (2008) (plurality opinion)); *Rite Color Chem.*, 105 N.C. App. at

20 20; *see also Bigler*, 213 Cal. App. 4th at 735 (noting that the party opposing arbitration has

21 the burden of proving the defense of unconscionability).  To establish unconscionability, a

22 party must demonstrate both procedural unconscionability and substantive

23 unconscionability. *Westmoreland*, 218 N.C. App. at 80.; *see also Armendariz*, 24 Cal. 4th

24 at 114.  "[B]oth elements must be present, but a court may rule a contract is unconscionable

25 when the contract presents pronounced substantive unfairness and a minimal degree of

26 procedural unfairness or vice versa." *Westmoreland*, 218 N.C. App. at 80; *see also*

27 *Armendariz*, 24 Cal. 4th at 114.

28

"Procedural unconscionability" arises when the bargaining that led to the contract involved "unfair surprise, lack of meaningful choice and inequality of bargaining power." *Westmoreland*, 218 N.C. App. at 80; *see also Bigler*, 213 Cal. App. 4th at 736 (procedural unconscionability "focuses on oppression, surprise and the manner in which the agreement was negotiated"). "Substantive unconscionability" "refers to harsh, one-sided and oppressive contract terms." *Westmoreland*, 218 N.C. App. at 84; *see also Bigler*, 213 Cal. App. 4th at 736 (finding that substantive unconscionability "focuses on 'the actual terms of the agreement and evaluates whether they create such overly harsh or one-sided results as to shock the conscience'" (quoting *Young Seok Suh*, 181 Cal. App. 4th at 1514)). "A court will generally refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 214 (1981); *see also Bigler*, 213 Cal. 4th at 736.

Respondents have failed to demonstrate that either procedural or substantive unconscionability exists in this case. All parties are legal entities, not individuals, with equal bargaining power. There is no evidence that there was any "unfair surprise" or "lack of meaningful choice." Respondents argue that the parties to the Management Agreement were all "owned and controlled by the same individuals." (Opp'n at 22.) And since "the parties were affiliates," they "had no interest in ensuring that the various provisions of the Management Agreement would be fair and reasonable." (*Id.* at 23.) The Court disagrees. First of all, assuming that a unity of interest when executing the contract can rise to the level of procedural unconscionability—a questionable supposition—there is insufficient evidence that all parties to the Management Agreement were "owned and controlled by the same individuals." Although it appears there was a unity of interest between Portfolio and SDHCO, there is no claim that 1250 North or Oak Coast, also parties to the negotiation, were owned or controlled by the same individuals.

Nor is there any evidence that the agreement was "one-sided" or "oppressive."  The arbitration agreement is not one that "shocks the conscience."  Respondents argue that five provisions make the agreement substantively unconscionable:  (1) the agreement that the arbitration must occur within ten days; (2) the prohibition on discovery; (3) the rule that the Arbitrator much reach a decision within three days; (4) the limited pool of Arbitrators; and (5) the rule that the parties must choose an Arbitrator within five days.  With respect to the timing of the Arbitration and Arbitrator's decision, the Agreement actually provides that the parties can agree in writing to a different date, so the ten days is not set in stone. Additionally, there is no provision that requires the Arbitrator to reach a decision in three days.  Instead, the Agreement provides that the Arbitrator will reach a decision on whether consent was reasonably withheld within three days.  Again, this is presumably so the Arbitration can take place as quickly as possible.  Neither of these provisions "shock the conscience."  Additionally, although Respondents argue that there is a limited pool of Arbitrators, the qualifications requirement does not seem unreasonable, and Respondents do not argue that Arbitrators that fit these qualifications do not exist.  *See, e.g.*, *AT&T v. Mobility, LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (noting an arbitration agreement may specify "that the decisionmaker be a specialist in the relevant field")  Furthermore, providing that the parties have five days to attempt to reach a mutual agreement as to the designated Arbitrator and, if that is not possible, giving another five days for each party to designate their selected Arbitrator, does not seem overly harsh or oppressive.

The limitation on discovery does give this Court pause.  California has held, in the employer-employee context, that "[a]dequate discovery is indispensable for the vindication of statutory claims" to ensure the minimum standards of fairness.  *Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 716 (2004) (citing *Armendariz*, 24 Cal. 4th at 104).  But the concern in *Fitz* was the unequal position between the bargaining parties.  In this case, the parties involved LLC entities with equal bargaining positions.  As pointed out by the Fourth Circuit, "[w]hen the contracting parties stipulate that disputes will be submitted to arbitration, they relinquish the right to certain procedural niceties which are normally

associated with a formal trial.   One of these accoutrements is the right to pre-trial discovery." *Burton v. Bush*, 614 F.2d 389, 390 (4th Cir. 1980).   To the extent California holds to the contrary, as discussed above, the Court finds upholding the parties' choice of law provision in the Agreement is appropriate.   The difference in the law does not contravene a fundamental policy in the state of California given the relatively equal bargaining positions of the parties.

Therefore, the Court finds that the arbitration agreement is neither substantively nor procedurally unconscionable.

## III.    CONCLUSION AND ORDER

For the reasons stated above, the Court **GRANTS** the Petition to Compel Arbitration.   (ECF No. 1.)   The parties are ordered to submit the dispute regarding the Management Agreement only for arbitration.

Although at oral argument the parties suggested that this Court may wish to stay its ruling pending decision by the New York appellate court, the Court finds the arbitration clause in the Management Agreement allows the parties to agree in writing to delay the arbitration, so the Court defers to the parties if they choose to put out Arbitration to a later date.   The Clerk of the Court is directed to administratively close this case.

**IT IS SO ORDERED.**

**DATED: September 8, 2021**

**Hon. Cynthia Bashant**
**United States District Judge**

21cv314